*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| SIMONE K. GREENWAY, | ) | |
| | ) | Supreme Court No. S-14321 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-07-10280 CI |
| v. | ) | |
| | ) | O P I N I O N |
| LARRY D. HEATHCOTT, | ) | |
| | ) | No. 6750 – February 15, 2013 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Jeremy Collier, Law Offices of Joshua Fannon, Palmer, for Appellant. No appearance by Appellee.

Before: Carpeneti, Chief Justice, Fabe, Winfree, and Stowers, Justices, and Eastaugh, Senior Justice.[*]

EASTAUGH, Senior Justice.

## I.     INTRODUCTION

Simone Greenway sued Larry Heathcott alleging, among other things, identity theft and breach of domestic partnership and fiduciary duties. After a long, one-day bench trial at which both parties were pro se, the superior court denied Greenway's

_____

[*]     Sitting by assignment made under article IV, section 16 of the Alaska Constitution.

claims. She argues here that it was error not to continue the trial so a particular lawyer could represent her when he became available, so she could compose her case, and so she could obtain testimony from a witness whose subpoena was quashed. She also argues that the court failed to help her sufficiently and failed to explain she could call the witnesses telephonically after it rejected her witness affidavits. We conclude that the court did not abuse its discretion as to these issues.

She also asserts that the trial judge was biased, or appeared to be biased, against her. The audio recording of the trial refutes these assertions and demonstrates that the trial judge was impartial, patient, and courteous in dealing with Greenway and in trying to obtain understandable evidence from her.

We therefore affirm the superior court judgment.

## II. FACTS AND PROCEEDINGS

### A. Facts

Simone Greenway met Larry Heathcott in Alaska. They began a relationship and Heathcott moved into Greenway's Wasilla house in February 2000.[1]

In May 2003 a vehicle driven by Heathcott struck and injured Greenway. Greenway later claimed that Heathcott misappropriated part of what Heathcott's insurer paid to settle her resulting personal injury claim.

In 2005 Heathcott left Alaska for Texas on his motorcycle. After he left, Greenway allegedly noticed irregularities in documents and accounting records that

---

[1] Our fact description relies on the trial court's findings and the appellate record, including the audio pretrial and trial recordings. The recordings have been invaluable in assessing Greenway's arguments, especially her contentions the trial judge was biased, or appeared to be biased, against her.

Greenway's 78 trial exhibits were returned to her after trial, and are not in the appellate record. She has submitted no trial exhibits to us.

indicated to her that her identity had been stolen, and that Heathcott had stolen, or had helped steal, it.

## B. Proceedings

Greenway sued Heathcott in September 2007; her 2008 amended complaint alleged that he had breached his domestic partnership duties, breached his fiduciary duties, stolen her identity, taken advantage of her credit, and fraudulently collected her insurance and unemployment payments.

Superior Court Judge Stephanie E. Joannides originally scheduled trial for January 2009, and then scheduled a two-day trial for July 2009. Trial was continued or rescheduled several times at the parties' requests, once after Heathcott was injured in an accident, and again after Greenway made a request that cited her health and the need to get legal assistance. Greenway was pro se after April 8, 2009, when her then-lawyer was allowed to withdraw. Trial was ultimately rescheduled to begin April 18, 2011.

On April 6, 2011, 12 days before trial was to begin, Greenway moved to continue the April 18 trial. Superior Court Judge Andrew Guidi denied that motion on April 8. On April 15 Greenway, citing different reasons, again moved for a continuance. Judge Guidi denied that motion. Judge Guidi later explained both orally and in writing why he had denied both motions. Greenway argues on appeal that denying her April 15 motion was an abuse of discretion and also demonstrates judicial bias, or the appearance of bias, against her.

The morning of trial, the trial court granted the United States's motion to quash Greenway's subpoena for FBI Agent Charles Clapper. She had intended to call him to support her identity theft claims. Greenway argues on appeal that the court abused its discretion by failing to grant her a continuance so she could obtain Agent Clapper's evidence.

Greenway called lawyer Richard Kibby as her first witness. He had represented her in a divorce proceeding about 20 years before, perhaps in 1991. He often testified he could not remember when he was asked about past events. He testified that it was a "guess" that he had dealings with Heathcott in 1994 or 1995.[2] Greenway claimed that Heathcott had collaborated in the mid-1990's with Rhonda Jasek, a former girlfriend of Heathcott, to perpetrate fraud or identity theft against Greenway.

When Greenway called Heathcott as her second witness, the superior court asked if there was "some reason" Heathcott had to testify then, given that he would testify on his own behalf later in the trial. Although the court then allowed Greenway to call Heathcott to the stand, she argues that this exchange demonstrates judicial bias or the appearance of judicial bias.

Greenway asked Heathcott how he was able to buy a house in Texas if he had no money; he replied that he bought the house with no money down. A document seemed to confirm he made no down payment. Regarding Greenway's claim that he had misused part of her personal injury recovery, Heathcott testified when Greenway called him to the stand that he used $7,000 to get a secured loan for funds needed for medical care for both himself and Greenway. He testified later at trial that the other $10,000 was invested at Greenway's request in high-risk options that were worthless when they expired. He also testified later that he was penniless when he left on his motorcycle in 2005. Greenway asked Heathcott whether he had known her in 1995, to which he responded "no." She also asked him questions not obviously related to her claims, such as why he doesn't celebrate Christmas, whether he is a Muslim, and why he stopped her

---

[2] Appellant's brief states that Kibby "testified that he knew Mr. Heathcott as early as 1994/95." But Kibby's testimony was much more equivocal than appellant's brief asserts, and the court permissibly credited Heathcott's testimony that he first arrived in Alaska in 1999.

from skiing. Heathcott seemed confused by these questions, and generally testified that he did not know what she was talking about.

Greenway testified on her own behalf and introduced 78 exhibits, all of which were admitted into evidence. She stated that Heathcott had left her with six boxes of documents, some of which she thought supported her claims. Many of the documents and much of her testimony seem to concern events, such as an encounter with police in which she was injured, that had no obvious relevance to establishing Heathcott's liability on the claims being tried. The superior court often interrupted her testimony to ask questions in attempts to determine what she meant, or the significance of various documents. Greenway testified that in 1991 Rhonda Jasek, Heathcott's former girlfriend, had started "becoming [Greenway]." Greenway seemed to contend that Richard Kibby had been given a power of attorney to act for Greenway in 1994-95, had been (in the court's summarizing words) in "cahoots" with Heathcott, and had made Heathcott Greenway's fiduciary. She also seemed to contend that many of her exhibits were documents Heathcott could not or would not have possessed unless he had been trying to steal her identity. She seemed to believe that, in an attempt to intimidate her, he had left them for her to find when he left Alaska in 2005.

Greenway introduced into evidence a sheet of thumbnail-sized photographs and asserted that they depicted her. She argues on appeal that the judge then made comments that demonstrate judicial bias or the appearance of bias.

Greenway interrupted her own testimony to present the telephonic testimony of Carl Bauman. He is a superior court judge who explained that he was testifying under subpoena in his private capacity and not as a judge. He explained that he was then in a relationship with Greenway. He testified that his current law clerk was Jeremy Collier, that Collier had known Greenway and her son for many years, that Collier had "indicated that he would represent" Greenway in the future, but that Bauman

had not encouraged Collier to represent her. Bauman testified that he believed Greenway's difficulty in opening bank accounts may have resulted at least in part from identity theft issues, but that he had no personal knowledge of who may have stolen her identity and no independent knowledge Heathcott was responsible for the theft.

When Greenway resumed her testimony, she introduced documents, such as telephone bills and medical records, to support her claim of identity theft. For example, she introduced a medical record of a test that she claimed had been conducted in Texas, where she had never lived. The superior court pointed out that the document showed that the test had been conducted in Alaska, but had been sent for evaluation to a laboratory in Texas. She also introduced a document describing a student loan for her son and bearing the date of "1998," before her son had begun college. The superior court remarked that it appeared "1998" was on the document because that was the effective date of the interest rate, not necessarily the date of the loan.

Toward the end of trial, when Greenway asked about affidavits she had gathered, the court told her it would not accept affidavits in lieu of testimony. She argues on appeal that the court abused its discretion by failing to tell her the witnesses could testify telephonically, and that the episode demonstrates judicial bias or the appearance of bias.

Late in the trial, the court asked Greenway which exhibits most clearly supported her claims and whether she thought there was one document (a "smoking gun") that proved her claims, or whether she considered a combination of things and documents proved her claims. She argues here that these questions demonstrate bias or the appearance of bias.

Heathcott testified again, on his own behalf. He denied stealing Greenway's identity, talking with Rhonda Jasek after she left Alaska in 2000, or being in Alaska when many of the incidents of supposed identity theft occurred. He stated that

Greenway had accused him of being a member of Al Qaeda, having a secret Russian bride, and sending subliminal messages from his computer to her television. When the court asked her about this, Greenway confirmed that she still thought Heathcott was sending subliminal messages to her television.

Three days after trial ended, the court issued written fact findings and legal conclusions rejecting Greenway's claims, including her identity theft and fraud claims. The court concluded that Greenway had not met her burden of showing fraud or identity theft. We set out in an appendix some of the findings and conclusions most pertinent to this appeal.

Greenway appeals.

## III.   STANDARD OF REVIEW

We "will not disturb a trial court's refusal to grant a continuance unless an abuse of discretion is demonstrated. An abuse of discretion exists when a party has been deprived of a substantial right or seriously prejudiced by the lower court's ruling."[3] We consider "the particular facts and circumstances of each individual case to determine whether the denial was so unreasonable or so prejudicial as to amount to an abuse of discretion."[4] We review for abuse of discretion "decisions about guidance to a pro se litigant, and decisions about the admissibility of evidence."[5] We also review denial of a motion to disqualify a judge for abuse of discretion.[6]

It is not obvious what standard of review applies to an appellate claim that a trial court was biased, if the trial court had no opportunity — such as by motion for

---

[3]    *Azimi v. Johns*, 254 P.3d 1054, 1059 (Alaska 2011) (quoting *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989)).

[4]    *Bigley v. Alaska Psychiatric Inst.*, 208 P.3d 168, 183 (Alaska 2009).

[5]    *Shooshanian v. Dire*, 237 P.3d 618, 622 (Alaska 2010).

[6]    *Wasserman v. Bartholomew*, 38 P.3d 1162, 1170 (Alaska 2002).

recusal, disqualification, or new trial — to resolve a claim of judicial bias. The apparent choices seem to be de novo review and abuse of discretion review.[7] But the choice is irrelevant here, because we would reach the same conclusion under either standard.

## IV. ANALYSIS

### A. Was There Judicial Bias Or An Appearance Of Judicial Bias?

In what appear to be claims of actual bias, Greenway argues that the trial judge was biased against her and "acted as defense counsel for Mr. Heathcott, elevating the court's and Mr. Heathcott's agendas over that of Ms. Greenway." She argues that "the judge's demeanor, tone, and words" demonstrate bias.

Citing five incidents, Greenway also argues that the judge gave "the appearance of bias" against her by giving her the impression "through his rulings, his demeanor, and his tone" that he was "acting as [Heathcott's] defense counsel." She also appears to argue that the trial judge should have disqualified himself sua sponte. She asks for a new trial.

Greenway's brief presents her bias arguments last. We address them first, because judicial bias could moot an appellant's other contentions, and because judicial impartiality and the appearance of judicial impartiality are so important in our society.

It is not obvious what must be done to preserve for review a claim of judicial bias, if, as here, there has been no motion for recusal, disqualification, or new

---

[7] Greenway did not ask the trial court to rule on the issue of judicial bias, so there is no ruling for us to review. In reviewing a trial court's conduct, it would be odd to apply the less-deferential de novo standard of review, rather than the abuse of discretion standard, if an appellant raises no claim of bias in the trial court.

*Phillips v. State*, 271 P.3d 457, 459 (Alaska App. 2012), contains an excellent discussion of the standard to be applied in reviewing denial of a recusal motion when it is alleged the trial court should have been disqualified for an appearance of bias.

trial alleging judicial bias or the appearance of bias.[8] We assume, without deciding, the bias issues Greenway raises are properly before us.

A judge must recuse himself or herself if there is bias.[9] If the appearance of bias is involved, we have held that the judge should give weight to preserving the appearance of impartiality.[10] The justifiable reasons for recusal due to bias are listed in AS 22.20.020(a).[11] We have held that even incorrect rulings against a party do not show bias in and of themselves.[12] Finally, if a party alleges the appearance of bias, a "greater showing" is required for recusal.[13]

Alaska Code of Judicial Conduct Canon 3(E)(1) provides that if "the judge's impartiality might reasonably be questioned," the judge "shall disqualify himself or herself." This requirement includes "instances where: (a) the judge has a personal bias

---

[8]    In *Cook v. State*, 36 P.3d 710, 726 (Alaska App. 2001), the court of appeals rejected, as unpreserved, Cook's claim that the trial judge had engaged in a continuing course of conduct demonstrating apparent bias because that contention was not raised in Cook's unsuccessful motion for disqualification.

[9]    *Amidon v. State*, 604 P.2d 575, 577-78 (Alaska 1979) (holding that AS 22.20.020(a) requires recusal if there is bias).

[10]    *Id*. (noting that AS 22.20.020 does not require recusal, but that the judge should give weight to preserving the appearance of impartiality in light of provisions in the Alaska Code of Judicial Conduct).

[11]    *Jourdan v. Nationsbanc Mortg. Corp.*, 42 P.3d 1072, 1082 (Alaska 2002). These reasons include, among other things, the judge being a party to the case, being related to a party or the party's attorney, being a material witness in the case, or having a direct financial interest in the case. AS 22.20.020(a).

[12]    *Id*. (holding that even if an evidentiary ruling were to be held improper, the ruling would not rise to the level of bias).

[13]    *Lacher v. Lacher*, 993 P.2d 413, 420-21 n.21 (Alaska 1999) (quoting *Long v. Long*, 816 P.2d 145, 156 (Alaska 1991) (holding that a judge's involvement in past cases with negative outcomes for the appellant did not require recusal).

or prejudice concerning a party . . . ." Greenway quotes Canon 3(B)(5) and its commentary. They provide in pertinent part:

> In the performance of judicial duties, a judge shall act without bias or prejudice and shall not manifest, by words or conduct, bias or prejudice based upon race, color, sex, . . . disability, . . . or social or economic status. . . .
>
> ***Commentary.*** — A judge must refrain from speech, gestures, or other conduct that manifests bias or prejudice. . . .
>
> A judge must perform judicial duties impartially and fairly. A judge who manifests bias on any basis in a proceeding impairs the fairness of the proceeding and brings the judiciary into disrepute. Facial expression and body language, in addition to oral communication, can give others an appearance of judicial bias. A judge must be alert to avoid behavior that may be perceived as an expression of prejudice.

We first reject any implicit argument that the judge should have recused himself here. Greenway never asked for that relief, and there is no indication of any pre-existing bias or prejudice that would have justified pretrial recusal. And, having reviewed the trial proceedings and listened to the audio recording, we also conclude that there is no indication of any bias or prejudice justifying recusal after trial began.

We now consider the five incidents that, according to Greenway, demonstrate that the court acted, or appeared to be acting, as Heathcott's "defense counsel," and that gave at least the appearance of bias against her.

### 1.    Heathcott as Greenway's witness

Greenway first asserts that when she called Heathcott as a witness during her case-in-chief, the trial judge "interrupted and demanded" an explanation why Heathcott had to testify at that point in the trial. We have listened to the audio recording to assess Greenway's arguments that the judge's "demeanor, tone, and words" demonstrate bias. This is the verbatim exchange when she called Heathcott as a witness:

**Judge Guidi:** I think it would be more effective to let you — I'm assuming, Mr. Heathcott, were you planning to take the stand in this case?

**Heathcott:** Yeah on my own terms, basically.

**Judge Guidi:** Then — then I think that the app — then what I think I'd rather have you do is wait until Ms. — the rest of — well, Ms. Greenway is there some reason he has to testify now? Can you do him —

**Greenway:** It's quite important before we go on to these exhibits.

Immediately after Greenway stated that it was "quite important" that Heathcott then testify, the court permitted Greenway to call Heathcott as her witness. Nothing in the court's "demeanor, tone, or words" during this exchange indicates actual bias or gives an appearance of bias. Nor did the court appear to act as "defense counsel."

It was not problematic that the court, on its own initiative, asked whether it was better for Heathcott to testify only once, later in the trial. Both parties were pro se, and the exchange took place about half an hour after trial began. By then, Greenway had demonstrated her difficulty in adducing relevant evidence. The court might have permissibly concluded that it would help the parties, and the court as the trier of fact, if the court were to help guide the efficient presentation of evidence.

### 2. Witness affidavits

Greenway next argues that the trial judge objected "on his own volition" to her witness affidavits; she also contends that his objection was contrary to "indications by Judge Joannides that Ms. Greenway would be able to support her case with affidavits." In support, she cites the recording of the July 15, 2010 pretrial conference conducted by Judge Joannides.

Nothing in the exchange at trial supports a claim of bias. When the trial court, near the close of the trial day, said it was planning to close the evidence "today,"

Greenway asked, "How about affidavits?" The court answered that "affidavits are hearsay," and explained the importance of cross-examination. The audio recording of the court's ruling, words, demeanor, and tone does not objectively permit a conclusion that the court was biased, or appeared to be biased.

And nothing at the pretrial conference should have caused Greenway to think she could present witness evidence by affidavit at trial. Judge Joannides did not say expressly that Greenway could do so. Nor were her words "indications" such a practice would be permitted at trial. The pretrial discussion of affidavits appears to have concerned the pretrial exchange of documents and discovery and motion practice, not how the parties could present witness testimony at trial. Greenway invokes no legal theory, such as law of the case, to support a claim that any pretrial "indications" prevented the trial judge from rejecting untrustworthy evidence.

Finally, it was not remarkable that the trier of fact rejected this quintessentially hearsay and suspect evidence even absent an objection by Heathcott.[14] Greenway did not argue any legal theory why the affidavits were admissible, nor does

---

[14] *See Vachon v. Pugliese*, 931 P.2d 371, 381 (Alaska 1996) (citing 1 JOHN W. STRONG, MCCORMICK ON EVIDENCE § 55, at 244 (4th ed. 1992)) ("It is not an abuse of discretion for a judge to make *sua sponte* evidentiary rulings under certain circumstances . . . . Hearsay objections go to the competence of the evidence, are not mere technical exclusions, and therefore are within the discretionary power of the judge to exclude if justice requires.").

she on appeal.[15]  Moreover, both parties were pro se.  It was not an abuse of discretion to decline to accept affidavits in lieu of testimony subject to cross-examination.

### 3.    Thumbnail photos

Greenway next refers to the exchange that occurred when she introduced a proof sheet of thumbnail-sized photographs into evidence and testified that the images depicted her.  This is how her brief at page 23 describes the exchange:  "[T]he judge commented that Ms. Greenway looked like a man in a picture presented at trial, and then sought confirmation of that opinion from Mr. Heathcott, to which both the judge and Mr. Heathcott laughed."

This description mischaracterizes the exchange.  These are the court's actual words:  "My question, Ma'am, is can you tell for sure that that's your body in that picture, because that seems to me — it looks like a male body."  The court did not state at any time that "Ms. Greenway looked like a man" in that or any other picture.  The court was trying to determine whether, as she had testified, the image depicted her; the court was clearly referring to the image, not to her, when it said "it looks like a male body."

And contrary to the assertion that "the judge and Mr. Heathcott laughed" when the court commented about what the picture depicted, the only laughter audible to us during this exchange was uttered by Greenway and another female; the recording

---

[15]      Greenway identifies no evidentiary rule that might have rendered the affidavits admissible.  They are not in the record and she has not described how many there were, who made them, what they stated, or how they supported her claims.  We therefore could not say their rejection was either error or prejudicial.  Because she does not explain how she was prejudiced, there is no basis for reversal.  *Barton v. N. Slope Borough Sch. Dist.*, 268 P.3d 346, 353 (Alaska 2012) ("When the trial court has erroneously excluded evidence, a party must show that the error was harmful or prejudicial before we will reverse.").

contains no audible laughter attributable to the judge or Heathcott. The court asked Heathcott to look at the disputed image and say whether it seemed to depict a male's body, but it did not ask Heathcott to agree that Greenway "looked like a man," as Greenway's brief suggests.

Greenway contends that she found the court's remarks "distasteful," "demeaning," and "sexist," and it appears that she genuinely believed she had been insulted. But having carefully listened to this exchange, we are convinced that her subjective belief at trial was not objectively justified by what the judge actually said or how he said it. When Greenway told the court she thought its comment was "insulting," the court patiently and calmly explained that "ma'am, I'm not trying to insult you." Considered in context of the identity question, the court's comments do not seem "sexist," and the audio recording does not support the contention that the court and Heathcott shared a private, distasteful joke at her expense. We detect no offensive content or tone in what the court said. The audio recording establishes that the court asked about the disputed image respectfully, and did not, in its words or tone, demean her appearance.

Greenway's testimony that these very small photos, including the disputed image, were of her, made it relevant for the court to determine whether they actually depicted her. The court described the proof sheet images as being only "one-half by one-half inch." The exhibits are not available to us, but the appellant's claim of bias turns on what she claims — erroneously — the judge said and how he said it.

### 4.    "Smoking gun"

Greenway next argues that something the court said about her exhibits at the close of her case demonstrates bias. Her brief at page 24 states that the court "indicated . . . Ms. Greenway would need to show him a 'smoking gun' if she had it, or rest her case."

Here is what the court actually said:

I just want to give you one more chance to tell me if — and I hate to use this term, it's such an overused term, but is there a document — you've brought a whole box of [inaudible] records — that you think is just an absolute smoking gun proof that Mr. Heathcott stole your identity and was — or was, you know, we'll just stop there, that or is it just the combination of little things and all these little doc — all these other documents adding up, and that's the conclusion you want me to draw from it?

Appellant's brief misdescribes the court's actual words and the court's objectively apparent purpose. The court was giving Greenway an opportunity to specify which of her many documents most clearly supported her claims. It was also asking whether she thought there was one document that proved her claims, or whether she thought a combination of things and documents proved her claims. The court's words made it clear it would consider all her admitted exhibits and all the evidence, even if there were no "smoking gun." The court admitted all of Greenway's exhibits and agreed to consider them and it did not tell her she would have to either produce a "smoking gun" or rest her case.

The court's words implicitly expressed some doubt about the strength of Greenway's claims against Heathcott. Given the evidence, any such doubt would have been both unremarkable and appropriate, and would not have indicated bias against Greenway. The court's inquiry came at the end of a long trial day during which Greenway had failed to adduce evidence that Heathcott had harmed her. The inquiry gave Greenway an additional opportunity to focus her case and emphasize her most probative evidence.

-15-                                                6750

We conclude that the court's words, tone, and demeanor during this exchange do not objectively support an assertion that the court was biased against her or gave a reasonable appearance of bias against her.

### 5. Continuance denial

Finally, Greenway contends that denying her a continuance shows bias. She asserts that the court elevated the interests of the court and Heathcott above hers. She also asserts that the court "insinuated" it knew better than she her proper trial tactic, favoring Heathcott and harming "the unprepared" Greenway.

Nothing in the court's rulings, words, demeanor, or tone in denying a continuance or explaining its denial reflects bias, or an appearance of bias, against Greenway. The court did not demonstrate bias when it noted the potential effect a continuance might have on Heathcott and explained that a continuance might be detrimental to Greenway. Party prejudice and judicial convenience are always potentially relevant to a continuance motion.[16] And there is no indication the court gave unjustified importance to its own availability and convenience.[17]

In short, Greenway's contentions of bias and the appearance of bias are unwarranted. The audio recording instead demonstrates that the trial judge dealt patiently, fairly, and courteously with both parties, and gave Greenway extra

---

[16]  *Gottschalk v. State*, 602 P.2d 448, 451 (Alaska 1979) (noting that denial of a continuance was not an abuse of discretion when granting it would have inconvenienced the court and at least one witness); *see Green v. State*, 544 P.2d 1018, 1023 (Alaska 1976) ("While blind adherence to the requirements of court calendaring should never be used as an excuse to deny one accused of a serious crime the fundamental right to organize his defense, there is a compelling public interest in the prompt and orderly disposition of such matters.").

[17]  For reasons we discuss in Part IV.B, the trial court did not err by failing to continue the trial.

opportunities to explain her claims and address the court's reservations about her evidence.

## B. Was It An Abuse Of Discretion Not To Grant Greenway Another Continuance?

Greenway filed suit in September 2007. Trial was originally set for January 2009, but was rescheduled or continued several times upon requests by both parties.[18] It was re-set for a two-day trial in July 2009 and then, after Greenway filed a request citing her health and her need to get legal assistance, rescheduled for February 2010. (She nonetheless remained self-represented after April 2009.) At the July 15, 2010 pretrial conference, Judge Joannides rescheduled trial for April 18, 2011; the order stated, "The trial will last [three] trial days." Judge Joannides told the parties: "I have you set for three mornings."

Greenway advances three arguments in contending that it was an abuse of discretion not to grant her an additional continuance.

### 1. Continuance so Greenway could retain a particular attorney

Greenway first argues that the court should have granted her request for a three-month continuance, "at least until September," so "her chosen attorney" could represent her. The only motion seeking that relief was her April 15, 2011 motion, filed, and denied, three days before trial was to begin.[19]

That motion described Greenway's personal and medical history, indigency, and emotional state and argued that the absence of counsel would compromise

---

[18]    In denying Greenway's April 6, 2011 continuance motion, the court noted that she "has previously been granted two continuances of trial as well as continuances on other matters."

[19]    Counsel other than Greenway's present lawyer made limited appearances for Greenway in filing the April 6 and April 15 continuance motions.

her "right to a fair trial on a level playing field."[20]  It asserted that Jeremy Collier, a recent Alaska Bar admittee and friend of her son, had said he would represent Greenway "after he becomes available in mid August, 2011."  It asked that trial be continued "at least until September [2011]."  Greenway moved for expedited consideration, but did not request oral argument or ask the court to personally assess her ability to represent herself.

The court entered a short written order denying the April 15 motion the same day it was filed, thus giving it the expedited consideration Greenway requested. Trial was held on April 18, 2011, as scheduled.  After hearing the trial evidence, the court explained the continuance denial both orally and in writing.  Appendix A includes its written explanation.

"[A] party who seeks to continue a case for trial must show that he acted with due diligence upon the grounds for which continuance is sought."[21]  There is no general right to counsel in civil cases under the United States or Alaska Constitutions, and Greenway had no constitutional right to counsel in this case.[22]  A continuance for the

---

[20]    The April 15 motion requested reconsideration of Greenway's April 6 continuance motion, and argued that the court had "overlooked or misconceived" material facts about Greenway's inability to proceed pro se.  But the April 15 motion alleged numerous new facts and did not reassert the only continuance ground — her sister's illness — raised by the April 6 motion. It was therefore deficient as a motion for reconsideration.  Alaska R. Civ. P. 77(k)(2); *Miller v. Miller*, 890 P.2d 574, 576 n.2 (Alaska 1995) (holding that a dispute over parental responsibility cannot be raised for the first time in a motion for reconsideration).  Rather than decide whether the court should have reconsidered the April 6 motion, we decide whether it should have granted the April 15 request for a continuance.  Greenway does not argue that a continuance was required for the only reason raised in her April 6 motion.

[21]    *Azimi v. Johns*, 254 P.3d 1054, 1061 (Alaska 2011) (quoting *Sparks v. Gustafson*, 750 P.2d 338, 341 (Alaska 1988)).

[22]    *Id*.

purpose of finding and obtaining counsel requires a showing of diligence.[23]  When, as here, a party seeks a continuance so a particular lawyer can represent her in the future, the trial court must weigh various, often circumstantial, considerations, including the diligence of the moving party.[24]  In arguing that the court erred, Greenway emphasizes the complexity of her claims, her limited ability to represent herself, and the absence of prejudice to Heathcott.

The April 15 motion sought a continuance so a particular lawyer who was then unavailable could represent Greenway.  It did not explain why it was being made on the eve of trial, when the lawyer first expressed willingness to represent Greenway, or whether this was a new development.  All the other circumstances asserted — Greenway's long history of hardship, trauma, and tragedy, and the fact she had no lawyer — could have been raised in ample time before trial to prevent undue delay or possible inconvenience or prejudice to Heathcott.  As of April 15 the lawsuit was more than three and a half years old.

---

[23]     *See Taylor v. Gill St. Invs.*, 743 P.2d 345, 349 (Alaska 1987) ("A party is not automatically entitled to a continuance when counsel withdraws, especially if the party is not free from fault or does not use due diligence to obtain substitute counsel." (citing *Barrett v. Gagnon*, 516 P.2d 1202, 1203 (Alaska 1973))).

[24]     *See Azimi*, 254 P.3d at 1061 ("We are mindful that it is difficult for lay persons to represent themselves in court, but the superior court was correct to consider that Johns was also entitled to his day in court and that the case had already been stayed for six months at Azimi's request."). *Cf. Gregoire v. Nat'l Bank of Alaska*, 413 P.2d 27, 32-33 (Alaska 1966) (holding that it was not an abuse of discretion to deny a 30-day continuance so identified counsel could represent the moving party at trial, where the movant had agreed to the withdrawal of other counsel shortly before trial).

The motion was procedurally and substantively deficient. It was not supported by affidavit, as Civil Rule 40(e)(2) requires.[25] Its unsworn assertions that Greenway could not effectively represent herself were not supported by any assessment of a third person, such as a physician, counselor, or friend. The motion did not describe Greenway's past efforts to obtain replacement counsel after her prior lawyer had been allowed to withdraw on April 8, 2009, two years before the scheduled trial. The motion simply asserted that her "previous hopes to obtain an attorney have not panned out." It therefore failed to establish her diligence in finding replacement counsel. The motion was unsupported by any direct representation by Collier that he would represent Greenway — an omission that might explain why the court's post-trial explanation noted the "possibility . . . Collier may ultimately choose not to" represent Greenway. The motion did not describe Greenway's diligence in preparing for a pro se trial, although she had had ample time to prosecute her case since its inception and since the withdrawal of her lawyer two years before.

Additional facts came out at trial, three days after the motion was denied. There was testimony Collier was then a judicial law clerk, had known Greenway's family for many years, and had told his judge he was willing to represent Greenway after

---

[25] Continuance motions "must be supported by the affidavit of the applicant setting forth all reasons for the continuance." Alaska R. Civ. P. 40(e)(2). The motion was not sworn or verified by Greenway, and was not accompanied by an affidavit from herself or anyone else, including Collier. She cosigned the motion and stated, "[T]he statements are mine . . . and are true," but that statement did not make the motion an affidavit and did not satisfy alternative standards applicable when a notary is unavailable, in part because the motion did not state that it was certified "under penalty of perjury." AS 09.63.020(a). *Cf. Bennett v. Weimar*, 975 P.2d 691, 695 n.10 (Alaska 1999) (holding that the trial court was correct to not consider a plaintiff's response to a summary judgment motion because the response was not notarized and did not meet the requirements of AS 09.63.020(a)).

his clerkship ended in August. But Collier did not testify or otherwise confirm his willingness to represent Greenway. And although her difficulty in presenting a coherent case against Heathcott became evident after trial began, that circumstance did not require sua sponte reconsideration of the April 15 motion. Never after April 15 did Greenway renew her motion for a continuance so Collier could represent her.

Greenway made occasional comments at trial about the difficulty she had preparing and representing herself, but she did not again ask the court to continue the trial. She also commented after trial began that she had "wanted to wait until September to continue this," but this comment communicated no renewal of her April 15 continuance request. She has not argued that the court abused its discretion by failing to grant, sua sponte, a three-month continuance that she did not again request after her April 15 motion was denied.

We first conclude that the superior court did not abuse its discretion by denying the April 15 continuance motion as it was presented. Although Greenway focuses on the future availability of the particular attorney, she failed to demonstrate diligence in trying to replace prior counsel, who had withdrawn two years before trial. The apparently recent development that a particular lawyer would represent her in the future did not render irrelevant all other pertinent considerations, such as her diligence, the total delay likely, and potential prejudice. The information conveyed by the motion justified the court's factual finding (as expressed later orally and in writing) that granting the requested continuance would cause a very long additional delay. Greenway does not argue that the court erred in so finding. That additional delay would have made the case five years old before it could be tried.

Our conclusion is also confirmed by the relevant trial evidence, most of which the trial court discussed in its oral and written explanations for the denial. Its explanations discussed Kibby's fading memory and failing health and potential loss of

evidence, the possibility Kibby and other witnesses may not be around, the staleness of events that "occurred up to 17 years ago," Greenway's prior continuances, and the "possibility . . . Collier may ultimately choose not to engage himself to Ms. Greenway's service." The court found that if it had granted the requested continuance, "it is clear that trial would have to be continued for at least another year in order to allow counsel to re-open discovery." As the court recognized, whatever discovery there had been was unlikely to satisfy new counsel. And we observe that co-defendant Rhonda Jasek, who had allegedly stolen Greenway's identity or defrauded Greenway with Heathcott's help, had never even been served. After noting that the law clerk was not an experienced lawyer, the court orally explained that "even an experienced attorney from the time they started a case like this would need probably a year in the [indiscernible] to get this case ready."[26] The court also orally observed that Heathcott was entitled to finality. Greenway argues that a continuance would not have prejudiced Heathcott. (She asserts he would have incurred no additional legal fees or travel expenses because he was unrepresented and because, even though he lived in Texas, he periodically flew through Anchorage to work.) But the trial court justifiably thought a continuance would have caused substantial further delay, likely into the fall of 2012, and would have significantly delayed the end of the lawsuit, and thus Heathcott's repose. Even as early as the July 2010 pretrial conference, Heathcott had expressed frustration that the lawsuit was then lingering on, that he did not understand the basis of the claims against him, and that he considered the lawsuit "malicious and frivolous."

In the abstract, given the general value of having trial counsel, we assume that courts would be reluctant to deny a well-supported motion for a continuance so an

---

[26] The law clerk was prohibited from representing Greenway, or even preparing to do so, until after his clerkship ended in mid-August. Alaska Admin. R. 2(d).

identified lawyer could represent the moving party at trial. But that consideration would not render irrelevant other pertinent circumstances, such as party prejudice, undue delay of trial, or lack of diligence. That is the situation here.

Finally, neither in the superior court nor on appeal has Greenway addressed how counsel might have altered the outcome. She has not discussed how the outcome might have been different in a case the trial court found, after reviewing the evidence, to have no merit. Her relative disorganization did not prevent the admission of all the exhibits she offered, and it is apparent the trial court considered them. We acknowledge the difficulty of demonstrating on appeal how a lawyer would have helped at trial, given the theoretical possibility Greenway's lack of counsel kept her from doing the very things that might demonstrate prejudice. But that difficulty does not excuse her from at least addressing how lack of trial counsel now prevents her from showing prejudice.[27]

We conclude that the court did not abuse its discretion by denying the April 15 motion.

## 2. Continuance to obtain Agent Clapper's evidence

When trial commenced, the court granted the United States's motion to quash Greenway's subpoena for FBI Agent Clapper. Greenway had intended to call him to support her identity theft claim. She asserted that he was investigating that claim and had relevant information.

Greenway does not argue that it was error to quash the subpoena. Her brief instead asserts that the court should have granted "the requested continuance" of

---

[27] To show an abuse of discretion in denying a continuance, a party must show the party was deprived of "a substantial right" or was "seriously prejudiced" by the denial. *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1018-19 (Alaska 2009) (declining to reverse on the basis of a denied continuance, noting that the appellant had failed to show how a recently appointed attorney had prejudiced him).

unspecified duration so she could attempt to satisfy the government's requirements to obtain the agent's testimony. Her brief also contends that her "repeated exclamations that she needed Agent Clapper to prove her case" should have demonstrated the necessity of granting her "requested continuance." Her brief concludes that the "denial of the requested continuance" prejudiced her because Agent Clapper had documents and testimony "crucial" to her case.

The record contains no formal continuance request, written or oral, pertinent to Agent Clapper. We must therefore decide whether her words conveyed an informal request that should have put the court on notice that it needed to decide whether to "extend" or "continue" the trial so Agent Clapper's presence might be obtained.

Greenway was pro se, and did not effectively represent herself. But there was nothing inherently complex about asking the court for time to secure Agent Clapper's evidence, if Greenway desired that relief. Nor was there anything inherently complex about telling the court what documents she had given Agent Clapper and how they supported her claims against Heathcott. Doing so also would have helped the court realize she was asking for relief and would have helped it assess the importance of any such request.[28] Likewise, when the court informed the parties it hoped to close the

---

[28]  Although she generally argued below that documents she had given Agent Clapper were critical to her claims, she did not describe the documents in a way that would have allowed the court to appreciate their relevance or potential admissibility, nor does she do so on appeal.

She also did not tell the trial court that she expected to follow the procedure outlined by the Assistant U.S. Attorney to get Agent Clapper's testimony. The record does not indicate how long that procedure might have taken, but it required a written request that had to be evaluated by several individuals. The trial court interpreted the comments of the government as indicating the government did not want Agent Clapper to testify.

evidence that day, it would have been simple for Greenway to ask the court to allow Agent Clapper to testify in the future, if that is what she wished.

Neither her actual words nor the tenor of her comments put the court on notice that Greenway was asking for relief, rather than expressing disappointment. Her expressions of concern about her case, and of the importance of Agent Clapper, were not the equivalent of an informal continuance request. We therefore conclude that she did not request, even informally, a continuance for this purpose.

Because Greenway did not ask for a continuance so Agent Clapper could testify, the court had no opportunity to ask for Heathcott's response, to weigh the pertinent factors after hearing from both parties and considering whether relief was appropriate, and if it was, to fashion relief after weighing the parties' interests.[29] The circumstances are not so self-evident that we can say that it was plain error not to grant a continuance.[30] And we decline here to make a discretionary assessment the trial court was not asked to make.

---

[29] *Salazar v. State*, 559 P.2d 66, 72 (Alaska 1976), lists factors a trial court should consider when ruling on a request for a continuance to secure testimony:

> (1) whether the testimony is material to the case; (2) whether the testimony can be elicited from another source; (3) whether the testimony is cumulative; (4) probability of securing the absent witness in a reasonable time; (5) whether the requesting party was diligent and acting in good faith; (6) the inconvenience to the court and/or others; and (7) the likelihood that the testimony would have affected the jury's verdict.

[30] *Cf. Merrill v. Faltin*, 430 P.2d 913, 917 (Alaska 1967) ("[W]e shall consider plain errors, even though not objected to below, which are so substantial as to result in injustice.").

The leniency granted to pro se litigants did not excuse Greenway from requesting, at least informally, a continuance so she could obtain Agent Clapper's testimony. Greenway was not unaware that she could request a continuance; she had previously made four continuance requests, two of which were successful, and two of which had been made in the past 12 days.

Greenway's argument here rests on her assertion that she asked for a continuance to obtain Agent Clapper's evidence. She does not contend that the court abused its discretion by failing to grant a continuance she did not request. Because she did not ask for a continuance with regard to Agent Clapper, there is no basis for considering whether the court abused its discretion.

### 3. One-day continuance to prepare case for trial

When trial began and the court announced that it "hope[d] to close the evidence . . . today," Greenway protested; she told the court that "you didn't give me much time at all," that she had left at home trial resources she had intended to present at trial the next day, and that her case was complex.

Greenway's brief argues at pages 18 and 19 that it was an abuse of discretion to "refuse" to grant "the alternative motion for a one-day continuance" to permit her to prepare her exhibits and prepare for trial. But Greenway made no such "alternative motion," and the court did not "refuse" to grant any such unrequested continuance. Greenway did not ask on April 18, even informally, for any continuance. There was no continuance motion before the court after April 15. The last continuance motion was made and denied three days before trial began.

Greenway does not argue that a court must consider whether to grant sua sponte an unrequested one-day continuance, even in a pro se case. She cites no authority that would justify granting an unrequested one-day trial continuance, or that would justify, much less require, reversal for failing to grant an unrequested continuance.

In general, pro se litigants are granted considerable leeway with regard to procedural requirements.[31] In *Pieper v. Musarra*, the question was whether a party had preserved an issue on appeal.[32] We noted that the procedural leeway given to pro se litigants had to be balanced against concerns for judicial finality, judicial efficiency, and fairness to the opposing party.[33] A pro se's procedural defects have been excused when a deficiency results from "lack of familiarity with the rules."[34] But here appellant did nothing that informed the trial court it should advise her how to accomplish something she might have been attempting to do.[35]

Greenway's brief alleges circumstances that might have been relevant to an exercise of the trial court's discretion had she requested a one-day continuance. For example, she alleges that she was unable to effectively prepare or represent herself,[36] that

---

[31] *See, e.g.*, *Smith v. Sampson*, 816 P.2d 902, 906-07 (Alaska 1991) (considering pro se litigant's due process claims despite his failure to argue them on appeal).

[32] *Pieper v. Musarra*, 956 P.2d 444, 446 (Alaska 1998).

[33] *Id*.

[34] *Wright v. Shorten*, 964 P.2d 441, 444 (Alaska 1998) (internal quotation marks and citation omitted) (holding that the superior court should have considered Wright's procedurally deficient letter to be an answer to a complaint, in part because the letter stated that he did not know what he was supposed to do).

[35] Judges have a duty to inform pro se litigants how to correct procedural defects in what they are trying to accomplish, *Breck v. Ulmer*, 745 P.2d 66, 75 (Alaska 1987), but Greenway does not argue that the court breached any possible duty to inform her that she needed to move for a one-day continuance. And her comments were not sufficient to alert the court that she needed any guidance on how to correct any possible procedural deficiency in something she was trying to do.

[36] Her brief asserts that she was exhausted from reviewing exhibits and preparing for trial, that she was in pain and on pain medication, and that Heathcott had "systematically taunted and traumatized" her.

a one-day delay would not have prejudiced Heathcott, that because trial was originally scheduled for three days, it was inappropriate for the court to state that trial would only last one day,[37] that a one-day continuance would have allowed her to prepare her exhibits, and that she had left trial resources at home in the expectation that trial would last more than one day.[38]   But alleging these circumstances on appeal does not demonstrate that the trial court abused its discretion by not granting an unrequested one-day continuance.  The failure to request relief in the trial court presumptively precludes appellate review; a meaningful request would have allowed the trial court to hear from both sides, learn the relevant facts, and exercise its discretion after weighing the parties' needs.

## C.	Was It An Abuse Of Discretion Not To Tell Greenway She Could Call Witnesses Telephonically?

Greenway argues that after it rejected her witness affidavits, the court should have informed her she could call those witnesses telephonically.

---

[37]	The scheduling order did not guarantee three trial days, or even a second trial day, if there was no more relevant evidence to present.  The order granted each party "1.5 trial days."  And Judge Joannides told the parties that the trial was set for "three mornings."  Trial began at 8:42 a.m. and ended at 4:55 p.m.; it thus lasted 6.5 hours, not including breaks.  Heathcott took only about 21 minutes of trial time to present his direct evidence.

[38]	The case was tried in Anchorage.  Greenway resided in the Kenai Peninsula Borough.  As far as we can determine from the audio recording, Greenway did not describe the "trial resources" she left at home or explain their bearing on her claims.  Even if she had made a formal continuance request, the court would not have been justified in granting it for the "trial resources" reason absent any showing how her case would be harmed by not having those materials at trial.

Even though pro se litigants are granted considerable leeway with regard to procedural requirements,[39] we observed in *Bauman v. State, Division of Family & Youth Services* that "[c]ourts should not save a litigant from his choice of lawyer, including when a litigant chooses himself as legal representative."[40] We also stated that informing a pro se litigant of the need to do something (there, file a responsive affidavit) would require the court to become too involved in the litigant's case and that "[t]his open-ended participation by the court would be difficult to contain."[41]

Here, Greenway had already presented telephonic witness testimony earlier in the trial. She did not need to be told of a procedure she had so recently followed. We conclude that the court did not abuse its discretion by failing to inform Greenway that she could present witness testimony telephonically.

We also observe that the court often asked Greenway to clarify her testimony or to tie proffered evidence to her claims against Heathcott. It did so in an appropriate manner that should have helped Greenway understand and address the court's possible reservations about her evidence and her claims. In closing remarks, the superior court noted, "I had two choices: — I could either sit here and smile politely at you and nod my head and look like I understood what you were talking about or I could basically tell you that I didn't understand what you were talking about at times and ask you questions on it." The record reveals that the trial court frequently went out of its way to help this pro se litigant focus her case and introduce relevant evidence. It was not required to do more.

---

[39]  *See supra* note 31.

[40]  768 P.2d 1097, 1099 (Alaska 1989).

[41]  *Id.*

Greenway also argues that the court should not have told her the affidavits were inadmissible absent objection from Heathcott, and that Judge Joannides had suggested at the pretrial hearing that Greenway would be allowed to introduce the affidavits at trial. We discussed the affidavits and the relevance of the pretrial hearing in Part IV.A.2. We concluded there that the trial court did not abuse its discretion by rejecting the affidavits, and that Greenway's failure to demonstrate how she was prejudiced by their rejection also forecloses reversal.

## V. CONCLUSION

For these reasons, we AFFIRM the judgment of the superior court.

IN THE SUPERIOR COURT FOR THE STATE OF ALASKA

THIRD JUDICIAL DISTRICT AT ANCHORAGE

| | |
|---|---|
| SIMONE K. GREENWAY,<br><br>                    Plaintiff,<br><br>          v.<br><br>LARRY D. HEATHCOTT, et al.,<br><br>                    Defendants.<br>_____ | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 3AN-07-10280 CI |

## **TRIAL ORDERS**

The parties appeared before the Court on April 18, 2011 for trial. Both were self-represented. The Court now enters the following orders:

### I.  MOTION FOR CONTINUANCE

At the start of trial Ms. Greenway, renewed her motion for a continuance. The motion was denied for the reasons stated on the record, as again summarized in the Court's comments at the close of the evidence. The reasons include the following: (1) This action was filed in 2007 and plaintiff has already been granted two trial continuances; (2) plaintiff relies on testimony about events that occurred up to 17 years ago and which have already dimmed appreciably in the memory of the testimony of her witnesses, such as Richard Kibby, and (3) there is a significant risk of losing further evidence if trial is again delayed if the health of witnesses (such as Mr. Kibby) declines. Ms. Greenway and her significant other, Carl Bauman, testified that she expected to have the assistance of counsel at the end of August of this year, and she urges a delay until

then. They testified that a superior court law clerk in Kenai, Jeremy Collier, who is a long-time friend of Ms. Greenway's family, wishes to take on Ms. Greenway's case after his clerkship expires in August.[1] The Court cannot discount the possibility that upon becoming more familiar with the facts of the case, regardless of his present intentions, Mr. Collier may ultimately choose not to engage himself to Ms. Greenway's service. Beyond that problem, if the Court were to grant Ms. Greenway's request to allow for her retention of counsel in August, it is clear that trial would have to be continued for at least another year in order to allow counsel to re-open discovery. For all of these reasons, the Court does not find good cause for the continuance requested by Ms. Greenway.

## II. FINDINGS OF FACT AND CONCLUSIONS OF LAW

Based on the testimony and exhibits presented at trial, the Court makes the following findings and determinations:

### Findings of Fact

. . . .

8. Ms. Greenway testified that even though she did not meet or have any contact with Mr. Heathcott until October 1999, Mr. Heathcott and Ms. Jasek began conspiring from Texas, as early as 1991, to steal her identity. As Ms. Greenway puts it, she believes that Rhonda Jasek "was becoming her," i.e., Ms. Greenway, years before Ms. Greenway and Mr. Heathcott actually encountered one another.

. . . .

14. Ms. Greenway's pleadings allege an implied contract with Mr. Heathcott that they would share a permanent domestic partnership, and on that basis she seeks an equitable division of the property accumulated during their relationship. She

---

[1] Attorney Alexander Schutz, recently entered an appearance for Ms. Greenway that was limited to moving for a continuance.

also claims that he made promises to take care of her for the rest of her life. Mr. Heathcott denies she is due anything and responds that if any property division is warranted, it should favor him because he paid the mortgage on their home for years, supported Ms. Greenway when she stopped working, and left her vehicles and other property for which she has never paid. Mr. Heathcott has not filed a counterclaim, but he did present evidence at trial of the value of contributions he made to the home, to Ms. Greenway and evidence of the value of property he left with her.

15.    Ms. Greenway focused the entirety of her energy at trial on attempting to prove claims that Mr. Heathcott was her fiduciary and participated in a scheme to steal her identity and defraud her. Among other things, she alleged that, before he even met her, he somehow appropriated her tax refunds and took out student loans in the name of the children. Mr. Heathcott insists he never knew of Ms. Greenway until they met. He denies he ever lived in Alaska prior to 1999. He denies that he has ever attempted to steal Ms. Greenway's tax refunds or identity, or conspire with Rhonda Jasek to do so. He further denies that he has ever been Ms. Greenway's "fiduciary" or held a power of attorney over her affairs. He denies all of her charges of fraud and misrepresentation.

16.    The parties admit they never held each other out as husband and wife. The parties filed separate tax returns. The parties did not jointly own the house at 975 Plymouth Circle; title was solely in Ms. Greenway's name. There is no evidence they held joint title to any of the motor vehicles. The parties had no children together and did not participate in a joint business. There was evidence that Mr. Heathcott contributed to the improvement and expense of the home. Mr. Heathcott had a separate bank account but also set up a joint bank account with Ms. Greenway only so that he could, on occasion, transfer funds to her while he was on the North Slope. Mr. Heathcott

testified that he transferred funds to Ms. Greenway for a couple of months after he left Alaska "just to try to help her get on her feet."

17.    Neither party presented any evidence that they had an express or written agreement that they would live together indefinitely and share in the fruits of their relationship as though they were married.  They did not present any evidence concerning whether and how property accumulated during their cohabitation should be redistributed, nor did they present any evidence that they had an expectation that it would be.

Conclusions of Law

1.    As the plaintiff, Ms. Greenway has the burden of proving by a preponderance of the evidence her claims of domestic partnership, fraud, misrepresentation, and breach of fiduciary relationship, including her claims that Mr. Heathcott and/or Rhonda Jasek, stole and profited from her identity.

2.    In *Bishop v. Clark*, 54 P.3d 804, 811 (Alaska 2002), the court explained that "property accumulated during cohabitation should be divided by determining the express or implied intent of the parties." *Quoting Wood v. Collins*, 812 P.2d 951, 956 (Alaska 1991).  The *Bishop* opinion offered the following guidance:

> In determining the intent of cohabitating parties, courts consider, among other factors, whether the parties have (1) made joint financial arrangements, such as joint savings or checking accounts, or jointly titled property; (2) filed joint tax returns; (3) held themselves out as husband and wife; (4) contributed to the payment of household expenses; (5) contributed to the improvement and maintenance of the disputed property; and (6) participated in a joint business venture.  Whether they have raised children together or incurred joint debts is also important.

3.    Insofar as Mr. Heathcott may seek an interest in the property in Wasilla at 975 Plymouth Circle, he has the burden of presenting clear and convincing

evidence to controvert the express terms of title to the property. *Callahan v. Dye*, No. S-11390/11440, 2006 WL 2667668, at *8 (Alaska June 14, 2006). He has not met that burden.

4. At trial, Ms. Greenway did not present any evidence supporting her claim of a domestic partnership, implied contract, or of express promises to provide future support. The Court does not find sufficient evidence presented at trial to establish any of these claims. Insofar as Mr. Heathcott claims Ms. Greenway owes him for any of the property he left behind, the same conclusion applies. Indeed the parties' own testimony borders on a waiver of the domestic partnership claim.

5. Based on the evidence presented at trial, the Court does not find sufficient evidence to establish Ms. Greenway's remaining claims of fraud, misrepresentation, and breach of fiduciary relationship, particularly her claims that Mr. Heathcott and/or Rhonda Jasek, stole and profited from her identity. Ms. Greenway was unable to provide a rational and coherent factual basis for her allegations concerning stolen identity.[4] The Court finds Mr. Heathcott to be a much more reliable reporter of events. Based on the evidence presented, it is impossible for the Court to conclude that Ms. Greenway's identity was necessarily stolen, let alone that defendant was the culprit.

Accordingly, IT IS HEREBY ORDERED the Court will separately enter judgment dismissing this action with prejudice, with costs to be awarded in defendant's favor.

ORDERED this 21st day of April, 2011, at Anchorage, Alaska.

/s/ Andrew Guidi
Superior Court Judge

---

[4] The Court has considered the records submitted as exhibits and cannot find they provide support for plaintiff's claims.